UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ADALAIDA QUILES,                              :

          Plaintiff,                          :

          vs.                                 :          No.  3:13cv1905(WIG)

CAROLYN COLVIN,                               :
Acting Commissioner of
Social Security,                              :

          Defendant.                          :
----------------------------------------------------X


**<u>RECOMMENDED RULING ON PENDING MOTIONS</u>**

Plaintiff Adalaida Quiles has filed this appeal of the adverse decision of the

Commissioner of Social Security denying her applications for a period of disability and disability

insurance benefits ("DIB") and supplemental security income ("SSI"). Plaintiff now moves,

pursuant to 42 U.S.C. § 405(g), for an order reversing this decision or, in the alternative, for an

order remanding the case for a rehearing.  [Doc. # 15].  Defendant has responded with a motion

to affirm the decision of the Commissioner.  [Doc. # 22].  For the reasons set forth below, the

Court recommends that the decision of the Commissioner should be affirmed.

**<u>Procedural History</u>**

Plaintiff filed a Title II application for a period of disability and disability insurance

benefits, alleging an onset date of September 14, 2006.  (R. 326).  Her claim was denied initially,

and upon reconsideration.  (R. 326, 378).  Plaintiff then filed a request for hearing; a hearing was

held before Administrative Law Judge Robert A. DiBiccaro (the "ALJ") on April 3, 2012.  (R.

216).  Present at the hearing were Plaintiff and her attorney.  (R.72).  Plaintiff provided the only

testimony at this initial hearing.  A supplemental hearing was held on August 17, 2012.  (R. 75).

1

At the supplemental hearing, the ALJ received testimony from Plaintiff and from a Vocational

Expert.  After the supplemental hearing, Plaintiff submitted further medical evidence to the ALJ,

which was admitted into the record.  (R. 72).  The ALJ issued a decision on October 22, 2012

concluding that Plaintiff has not been disabled from September 14, 2006 through the date of the

ALJ's decision.  (R. 72-85).  Plaintiff filed a request for review of the ALJ's decision; the

Appeals Council denied review, making the ALJ's decision final for appeals purposes.  This

appeal ensued.

## Factual Background

Plaintiff was 38 years old at the time of the hearing before the ALJ.  (R. 222).  She

attended three semesters of college but did not graduate.  (R. 224).  She has prior experience

working as an assistant manager at a retail store, as a cashier, and as a window assembler at a

factory.  (R. 103-104).  She has not worked since some point in 2007.  (R. 232).  Plaintiff has a

history of back pain, carpal tunnel syndrome, asthma, tendonitis of both upper extremities, type 2

diabetes mellitus, obesity, depression, and anxiety.

## Medical History

### A.  Physical Impairments

Plaintiff has been diagnosed with degenerative disc disease[1].  A lumbar MRI from

December 17, 2008 showed mild degenerative disc disease at L5-S1.  (R. 247).  Progress notes

from Southwest Community Health Center ("SCHC") from December 23, 2008 indicate that

Plaintiff complained of continuing back pain and that she appears to be in pain.  (R. 797).  On

June 7, 2010, Plaintiff went to St. Vincent's Emergency Department with complaints of lower

back pain.  (R. 632).  She had decreased range of motion.  (*Id.*)  Lower back pain was diagnosed,

---

[1]     Degenerative disc disease is a condition in which pain is caused from a damaged disc.
http://www.cedars-sinai.edu/Patients/Health-Conditions/Degenerative-Disc-Disease.aspx.

along with sciatica as a secondary diagnosis.  (R. 636).  A pain reliever was administered, and

Plaintiff was prescribed Percocet[2] 5mg and Valium[3] 5mg.  (R. 634).  Plaintiff was discharged

that same day.  (R. 635).  A lumbar MRI taken on June 9, 2010 indicated a small central disc

protrusion at L5-S1, otherwise negative.  (R. 756).

Plaintiff was admitted to Bridgeport Hospital with complaints of back pain after slipping

and twisting her back on July 17, 2011.  (R. 134).  A back sprain was diagnosed.  (R. 136).

Plaintiff was discharged that same day and was prescribed a Lidoderm patch and a Flector

patch[4].  A lumbar MRI taken on May 19, 2011 showed mild degenerative disc disease.  (R. 876).

On July 6, 2011, Plaintiff went to St. Vincent's Emergency Department complaining of

back pain.  (R. 978).  A dorsal strain was diagnosed.  (*Id.*)  Pain relieving medications were

administered, and Plaintiff was prescribed Percocet 5mg, Oxycodone[5] 325mg, and

Acetaminophen.  (R. 981).  Plaintiff was discharged that same day.  (R. 982).  The next day,

Plaintiff went to Bridgeport Hospital with complaints of continuing back pain despite treatment

from the day before.  (R. 134).  A back sprain was diagnosed.  (R. 136).  Plaintiff was discharged

that same day and was prescribed a Lidoderm patch and a Flector patch.  (*Id.*)  On July 10, 2011,

Plaintiff returned to St, Vincent's complaining of severe lower back pain and vomiting due to

prescription pain medication.  (R. 969).  A different type of pain reliever, Dilaudid, was

prescribed.  (R. 874).  An MRI of the thoracic spine taken on July 13, 2011 indicated a T6

hemangioma[6], otherwise normal.  (R. 875).

---

[2]      A pain reliever.  http://www.drugs.com.
[3]      Used to treat anxiety and/or muscle spasms.  http://www.drugs.com.
[4]      Both are pain relievers.  http://www.drugs.com.
[5]      A pain medication.  http://www.drugs.com.
[6]      A hemangioma is a build-up of blood vessels in the skin or internal organs.
http://www.nlm.nih.gov.

Plaintiff was admitted to St. Vincent's Emergency Department on November 15, 2011 complaining of pain in her lower back.  (R. 965).  Lumbar disc syndrome was diagnosed.  (*Id.*). Plaintiff was administered pain medication, was prescribed Percocet 10mg, Oxycodone 650mg, and Acetaminophen, and was discharged later that day.  (R. 967).

On October 24, 2012, Plaintiff went to Bridgeport Hospital complaining of worsening back pain.  (R. 127).  Plaintiff was provided with pain medication and given a prescription for Percocet for pain management.  (R. 129).

Dr. Stewart Gross, Plaintiff's treating physician for her carpal tunnel syndrome, indicated that Plaintiff had surgery on her left wrist in 2004, and that this surgery did not resolve her carpal tunnel syndrome or de Quervian[7] symptoms.  (R. 984).  In 2011, Dr. Gross noted that Plaintiff complained of consistent numbness and paresthesias in her left hand.  (*Id.*).  On August 11, 2008, Dr. Gross performed surgery on Plaintiff's left wrist.  (*Id.*).  In September 2008, Plaintiff complained of wrist pain and lack of range of motion.  (R. 1048).  Occupational therapy was prescribed, but Plaintiff did not complete it.  (*Id.*).  In December 2008, Plaintiff reported significant improvement in her symptoms.  (*Id.*).

An x-ray taken on March 20, 2012 showed normal results in Plaintiff's right forearm, wrist, and elbow.  (R. 1124-1128).  Plaintiff began to experience intermittent numbness and paresthesias in her right wrist in early 2012.  (R. 1040).  Dr. Gross performed a carpal tunnel release and a first dorsal extensor compartment release on April 30, 2012.  (*Id.*).  Plaintiff had no post-operative complaints on May 14, 2012.  (R. 1046).  She was asymptomatic in July 2012. (*Id.*).

---

[7]     A condition affecting the tendons on the thumb side of the wrist.
http://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/basics/definition/con-20027238.

Dr. William Lewis performed surgery on Plaintiff's left shoulder on March 7, 2007 after Plaintiff injured her should at work. (R. 989). An MRI of the left shoulder on September 24, 2011 showed moderate tendinosis of the distal supraspinatus tendon with mild progression since November 2006, and no evidence of rotator cuff tear. (R. 873).

An MRI from July 18, 2010 showed a mild soft tissue edema in the medial aspect of Plaintiff's right elbow without a discrete bone marrow or ligamentous abnormality. (R. 754). There was no significant elbow effusion. (*Id.*). The tendons and ligaments showed to be intact. (*Id.*).

SCHC progress notes from April 13, 2009 indicate that an x-ray of Plaintiff's right ankle was normal, her right foot had a 1 cm. planter heel spur, and her right knee was normal. (R. 791). Plaintiff went to St. Vincent's Emergency Department on July 15, 2010 complaining of pain in her right knee. (R. 625). An x-ray of the knee showed no evidence of fracture or dislocation; that joint spaces were preserved; and no aggressive bone destruction. (R. 628). Plaintiff was discharged and advised to follow up with an orthopedist. (*Id.*).

Plaintiff had an orthopedic clinic consultation at Bridgeport Hospital on March 20, 2011. Plaintiff complained about her right leg and of heel pain. (R. 152). She could not fully extent her knee by about ten degrees. (*Id.*). There was no effusion or instability on the knee. (*Id.*). Physical therapy was suggested for treatment of the knee. (*Id.*).

A CT scan of the head was taken on May 19, 2008 to address Plaintiff's clinical history of migraine headaches. (R. 848). The result was unremarkable. (*Id.*). Plaintiff was admitted to Bridgeport Hospital on September 1, 2009 for multiple medical problems. (R. 175). She was diagnosed with migraines and likely anxiety disorder. (*Id.*). A CT of the head was normal. (R.

176).  Tylenol appeared to alleviate her headache.  (*Id.*).  She was advised to follow up with her primary care physician regarding starting on prophylaxis treatment for her migraines.  (*Id.*).

### B.  Mental Impairments

Plaintiff saw Kathleen Ennis, APRN, on August 5, 2011 for depression, anxiety, and medication management.  (R. 959).  She had a Global Assessment of Functioning ("GAF")[8] score of 50.  (R. 960).  Ms. Ennis noted that Plaintiff's multiple medical problems have the potential to exacerbate her mental and behavioral health issues.  (R. 960).  Plaintiff reported compliance with antidepressant medication.  (*Id.*).  On August 25, 2011, Ms. Ennis noted that Plaintiff displayed a pattern of restlessness and hyperactivity.  (R. 963).  Plaintiff was instructed to follow the medication plan as described.  (*Id.*).  On October 6, 2011, Ms. Ennis noted that Plaintiff expressed feelings of hopelessness and helplessness associated with her medical conditions and decline in daily functioning.  (R. 962).  Medication appeared to be effective. (*Id.*).  Notes from October 17, 2011 indicate that Plaintiff described symptoms of anxiety and worry about issues relating to family and health.  (R. 961).  On December 22, 2011, Ms. Ennis noted Plaintiff was experiencing occasional anxiety and that ongoing issues with interpersonal relationships increase the risk of decomposition.  (R. 1023).  On January 13, 2012, Ms. Ennis noted that Plaintiff was experiencing ongoing anxious feelings and that Plaintiff reported poor concentration and indecisiveness.  (R. 1026).  Notes from January 19, 2012 indicate Plaintiff was experiencing feelings of helplessness, hopelessness, and worthlessness associated with chronic pain.  (R. 1028).  On March 15, 2012, Ms. Ennis noted that Plaintiff reported occasional

---

[8]       A GAF score "is a number from 1-100 that reflects the caregiver's judgment of the overt level of functioning." http://www.dhs.state.or.us/caf/safety_model/procedure_manual/appendices/ch4-app/4-5.pdf.  A score of 50 indicates serious symptoms or serious difficulty in social, occupational, or school functioning.  *See Diagnostic and Statistical Manual of Mental Disorders*, https://www.msu.edu/course/sw/840/stocks/pack/axisv.pdf.

dysfunctional thinking and occasional negative self-talk.  (R. 1030).  On April 12, 2012, Ms. Ennis noted Plaintiff's family problems were causing anxiety.  (R. 1107).  Notes from June 26, 2012 and July 23, 2012 indicate that Plaintiff continued to report feelings of helplessness, hopelessness, and worthlessness associated with chronic pain.  (R. 1114, 1116).

Plaintiff also saw clinician Carissa Mott for her mental health issues.  On July 25, 2011, Plaintiff reported back pain.  (R. 1037).  The session focused on health issues and pain management.  (*Id.*).  On September 9, 2011, Ms. Mott reported that Plaintiff obtained a position as a sales representative for Avon and feels better.  (R. 1035).  On August 29, 2011, Ms. Mott reports that Plaintiff discussed some family difficulties and appeared motivated for change.  (*Id.*). On October 24, 2011, Ms. Mott reported that Plaintiff appeared calm.  (R. 1033).  She noted that Plaintiff was actively looking for a job.  (R. 1034).

### Agency Documents

Plaintiff completed an Activities of Daily Living Report on November 29, 2010.  She reported that she takes care of her disabled son with the help of her oldest son; does some house cleaning; prepares meals three times per week; goes out and drives at least two to three times per week; shops online and in person; handles money; and goes out to eat with her sister once per month.  (R. 540-544).  She noted that she has difficulties bending down and holding a hairbrush, and that she uses a cane to walk when needed.  (R. 540, 545).

Carissa Mott completed a Mental Status Questionnaire on September 8, 2009.  In relation to task performance, Ms. Mott opined that Plaintiff maintains daily living, but that during her depressed moods she neglects self-care and has difficulty attending to her needs.  (R. 687).  She describes Plaintiff's mood as depressed and anxious at time with blunted affect.  (*Id.*).

On November 30, 2010, Ms. Mott completed a Mental Impairment Questionnaire. She opined that Plaintiff may have difficulties functioning during her depressive moods, and that she maintains activities of daily living most of the time. (R. 602). Regarding task performance, Ms. Mott remarked that Plaintiff can manage one or many tasks at a time, but has difficulty maintaining for long periods of time due to her physical ailments. (R. 603).

Medical consultant Dr. Abraham Bernstein completed a physical residual functional capacity ("RFC") assessment on May 26, 2011 and concluded that while Plaintiff's condition results in some limitations in her ability to perform work related activities, it is not severe enough to keep her from working entirely. (R. 364). He opined that Plaintiff's stated limitations and intensity of her symptoms are not fully supported by the objective medical evidence. (R. 359). Medical consultant Dr. Adrian Brown completed a mental RFC assessment on May 26, 2011. He found that Plaintiff is moderately limited in carrying out detailed instructions and maintaining attention and concentration for extended periods, but that she could carry out simple and repetitive tasks. (R. 361-362).

On September 6, 2011, Kathleen Ennis completed a Medical Source Statement. She indicated that she sees Plaintiff for psychotherapy and medication management, and that Plaintiff has a diagnosis of bipolar disorder. (R. 766). She opined that Plaintiff has issues with restlessness, focus, and mood swings. (*Id.*). She noted that Plaintiff has a marked limitation in her ability to deal with work stress. (R. 767).

Dr. Gross completed a narrative report on October 31, 2011 stating that Plaintiff had a left median neurolysis procedure three years ago. (R. 771). He noted that Plaintiff currently complains of numbness in her left thumb and index finger after returning to factory type manual work. (*Id.*). He indicated that Plaintiff had full range of motion in her left digits, wrist, and

elbow and had tenderness in her elbow and forearm.  (*Id.*).  His impression was acute median neuritis, left, and chronic generalized upper extremity tendinitis, left.  (*Id.*).  Heat therapy and use modification were recommended.  (*Id.*).

Sharon Joslin, APRN, of SCHC completed a Medical Source Statement on February 2, 2012.  She opined that Plaintiff could never lift or carry 51-100 pounds, could occasionally lift or carry 21-50 pounds, and could continuously lift or carry up to 20 pounds.  (R. 1015).  She further expressed that Plaintiff could sit for 6 hours without interruption, stand for 5 hours, and walk for 2 hours.  (R. 1016).  In her opinion, in an 8-hour workday, Plaintiff could sit for 4 hours, stand for 3, and walk for 2.  (*Id.*).  She indicated that Plaintiff does not require the use of a cane to ambulate.  (*Id.*).  She added that Plaintiff is unable to bend more than 100 degrees.  (*Id.*).  Ms. Joslin opined that Plaintiff can occasionally reach overhead and push/pull; can frequently handle, finger, and feel; and can continuously reach.  (R. 1017).  Further, Plaintiff can occasionally operate foot controls.  (*Id.*).  Ms. Joslin opined that Plaintiff can never climb ladders or scaffolds, and can never stoop, kneel, crouch, or crawl.  (R. 1018).  Further, Plaintiff can never tolerate exposure to unprotected heights.  (R. 1019).  Finally, Ms. Joslin opined that Plaintiff cannot use public transportation because of her physical impairments.  (R. 1020).

Ms. Ennis completed a Medical Source Statement on July 16, 2012.  She opined that Plaintiff has mild restrictions understanding and remembering simple instructions; carrying out simple instructions; and making judgments on simple work-related decisions.  (R. 1103).  She further indicated that Plaintiff has moderate restrictions understanding and remembering complex instructions; carrying out complex instructions, and making judgment on complex work-related decisions.  (*Id.*).  Ms. Ennis also opined that Plaintiff has mild difficulties interacting with the public, and moderate difficulties interacting with supervisors and co-

workers, and in responding appropriately to usual work situations and to changes in a routine work setting.  (R. 1104).

Finally, Dr. Gross completed a Medical Source Statement on September 5, 2012.  He opined that Plaintiff could never lift or carry 51-100 pounds, could occasionally lift or carry 21-50 pounds, could frequently lift or carry 11-20 pounds, and could continuously lift or carry up to 10 pounds.  (R. 1140).  He further remarked that Plaintiff could sit for 3 hours without interruption, stand for 2 hours, and walk for 6 hours.  (R. 1141).  In his opinion, in an 8-hour workday, Plaintiff could sit for 6 hours, stand for 4, and walk for 6.  (*Id.*).  He indicated that Plaintiff does not require the use of a cane to ambulate.  (*Id.*).  Dr. Gross opined that Plaintiff can occasionally reach overhead and push/pull; can frequently handle, finger, and reach; and can continuously feel.  (R. 1142).  Further, Plaintiff can continuously operate foot controls.  (*Id.*).  Dr. Gross found that Plaintiff can frequently climb stairs and ramps, and can occasionally climb ladders or scaffolds, balance, stoop, kneel, crouch, and crawl.  (R. 1143).  Regarding environmental limitations, Dr. Gross opined that Plaintiff can never tolerate exposure to unprotected heights, extreme cold, extreme heat, or vibrations.  (R. 1144).  Finally, Dr. Gross added that Plaintiff should not perform repetitious manual activities throughout the day.  (R. 1145).

## **Proceedings before the ALJ**

At the initial hearing, Plaintiff testified that she attended three semesters of college.  (R. 224).  She testified that her last job was at Walgreens, where she had worked from 2003-2007.  (R. 224-226).  She began work there as a cashier, then became an assistant manager.  (*Id.*).  Regarding other jobs, Plaintiff worked as an assistant manager at two other retail stores, and also worked at two factory jobs.  (R. 226-227).

10

Plaintiff testified that she had two surgeries on her hands relating to carpal tunnel syndrome.  (R. 232).  She testified to having severe tendonitis in both arms.  (*Id.*).  She added that she had shoulder surgery on her left side in March 2007, and that she continues to find it difficult to lift overhead on her left side.  (R. 237).  She noted that pain in her right arm began four to five months ago, and there are no limitations with her right arm.  (R. 239).

Plaintiff further testified that she experiences pain in her upper shoulders daily and in her lower back sometimes.  (R. 244).  She added that bending, lifting, and walking bring on her lower back pain.  (*Id.*).  She can bend to at least her knees and can walk one quarter of a mile.  (R. 245).

Additionally, Plaintiff testified that her anxiety would affect her on a job because she gets anxious when things are not done right and when she is around other people outside of her home.  (R. 247).

Finally, Plaintiff testified that her ten-year-old son is completely disabled, and that she cares for him with the help of her oldest son and her sister.  (R. 248-249).  She notes she drives once or twice per week and takes walks around the block three times per week.  (R. 223, 251).

## The ALJ's Decision

The ALJ properly applied the established five-step, sequential evaluation test for determining whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Step one determines whether the claimant is engaged in "substantial gainful activity."  If she is, disability benefits are denied.  20 C.F.R. §§ 404.1520(b), 416.920(b) (2010).  Here, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date, September 14, 2006.  (R. 75).

At step two, the ALJ evaluates whether the claimant has a medically severe impairment or combination of impairments.  In this case, the ALJ determined that Plaintiff has the following severe impairments: chronic generalized tendonitis of both upper extremities, status post multiple surgeries; degenerative disc disease; type two diabetes mellitus; obesity; bipolar disorder; and an adjustment disorder with mixed depressed mood and anxiety.  (R. 75).

At the third step, the ALJ evaluates the claimant's impairments against the list of those impairments that the Social Security Administration acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Part 404, Subpart P, App. 1 (2010) (hereinafter "the Listings").  If the impairments meet or medically equal one of the Listings, the claimant is conclusively presumed to be disabled.  In this case, the ALJ considered Plaintiff's physical and mental impairments and concluded that Plaintiff did not have an impairment that met or medically equaled one of the Listings.  (R. 76-77).

At step four, the ALJ must first assess the claimant's residual functional capacity ("RFC") and then determine whether the claimant can perform her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Here, after considering the record as a whole and evaluating Plaintiff's credibility and subjective complaints of pain and other symptoms, the ALJ found that Plaintiff has the RFC to perform medium work with the following limitations: she could sit for six hours, stand for four hours, and walk for six hours in an eight-hour workday, but needed a sit/stand option with the ability to change positions every two hours; she could occasionally reach overhead, push, and pull with the bilateral upper extremities and use them for frequent reaching in all other directions, handling, and fingering; she could occasionally climb ladders and scaffolds; balance, stoop, kneel, crouch, and crawl; she should avoid unprotected heights, extreme cold or heat, and vibrations but could have occasional exposure to humidity and

wetness; she could occasionally operate a motor vehicle and have frequent exposure to moving mechanical parts, dust, odors, fumes, and pulmonary irritants; she was limited to occasional interaction with supervisors, coworkers, and the public; and she could follow simple instructions and perform routine, repetitive tasks. (R. 77). The ALJ then determined that Plaintiff could not perform her past relevant work. (R. 82-83).

Through the first four steps, the burden is on the claimant. At step five, the burden shifts to the Commissioner to show that there are other jobs that exist in significant numbers in the national economy that Plaintiff can perform. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). Here, the ALJ relied upon the testimony of a Vocational Expert to determine the extent to which Plaintiff's limitations erode the medial unskilled occupational base. The Vocational Expert testified that a hypothetical individual of Plaintiff's age and with the same RFC, education, and work experience could perform the jobs of addresser, monitor, and copy examiner, of which there are a significant number of positions in the local and national economies. (R. 84). Accordingly, the ALJ determined that Plaintiff has not been under a disability from September 14, 2006, through the date of his decision.

## **Standard of Review**

Under 42 U.S.C. § 405(g), the district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Judicial review of the Commissioner's decision is limited. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). It is not the Court's function to determine de novo whether the claimant was disabled. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Court must review the record to determine first whether the correct legal standard was applied and then whether the record contains

substantial evidence to support the decision of the Commissioner.  42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...."); *see Bubnis v. Apfel*, 150 F.3d 177, 181 (2d Cir. 1998); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).

When determining whether the Commissioner's decision is supported by substantial evidence, the Court must consider the entire record, examining the evidence from both sides. *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  Substantial evidence need not compel the Commissioner's decision; rather substantial evidence need only be that evidence that "a reasonable mind might accept as adequate to support [the] conclusion" being challenged.  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) (internal quotation marks and citations omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks and citation omitted).

<u>**Discussion**</u>

In this appeal, Plaintiff raises the following arguments in support of her position that a reversal and remand of the ALJ's decision is required:

(1) The ALJ failed to develop the administrative record.

(2) The ALJ committed a number of factual errors, and made misstatements, distortions, and mischaracterizations of the evidence.

(3) The ALJ failed to properly follow the "treating physician rule."

(4) The ALJ failed to find that some of Plaintiff's illnesses and ailments are severe and failed to evaluate all of her illnesses and ailments singly and in combination.

(5) The ALJ failed to recognize that Plaintiff has a listed impairment.

(6) The ALJ did not properly determine Plaintiff's credibility.

(7) The ALJ failed to properly determine Plaintiff's RFC.

(8) Defendant failed to meet her burden of proof at step five of the sequential evaluation

process.

1.   Development of the Administrative Record

Plaintiff claims that the ALJ failed to adequately develop the administrative record such

that remand is required in order to allow the ALJ the opportunity to review records which were

outstanding at the time of the hearing.  The records that Plaintiff contends the ALJ should review

consist of Bridgeport Hospital admission notes (R. 126-127), and previously undisclosed records

from the Behavioral Health Department of the FSW Clinic (R. 312-325).

A hearing on disability benefits is a non-adversarial proceeding.  Even when a claimant is

represented by counsel, the "social security ALJ, unlike a judge in a trial, must on behalf of all

claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of

a benefits proceeding."  *Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009) (citation omitted).

The Social Security Act provides that, "[i]n making any determination with respect to whether an

individual is under a disability . . . the Commissioner of Social Security shall consider all

evidence available in such individual's case record, and shall develop a complete medical history

of at least the preceding twelve months. . . ."  42 U.S.C. § 423(d)(5)(B).

To begin, the Court rejects Plaintiff's argument that the records at issue include evidence

of a diagnosis of fibromyalgia.  Rather, the physician note indicates that Plaintiff reports a

history of fibromyalgia.  (R. 127).  This is not a definitive diagnosis.  In fact, the diagnosis from

Plaintiff's visit that day was "back pain."  (R. 129).

Additionally, Plaintiff has failed to show how she was prejudiced by the ALJ's failure to request these records. In *Lena v. Astrue*, No. 3:10cv893(SRU), 2012 WL 171305 at \*9 (D. Conn. Jan 20, 2012), the court rejected a similar argument where the plaintiff had failed to show how she was prejudiced. The court held that to demonstrate prejudice, the plaintiff must show that the additional reports would "undermine the ALJ's decision." *See id.* (internal citations and quotation marks omitted). "Absent any showing of prejudice, the ALJ did not fail to meet his burden of developing the record and did not rely on incompetent evidence in deciding this case." *Id. See also Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997) ("Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand.") (citation omitted); *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996) (holding that the ALJ's omission of retrospective medical analysis was not reversible error because there was nothing presented at the hearing to indicate that the retrospective assessments would have revealed any useful information).

Here, Plaintiff has not shown how the records at issue would have undermined the ALJ's decision. The Court has reviewed these records carefully and has determined that they are consistent with the record as a whole and with the ALJ's decision. Accordingly, the Court finds no error in the ALJ's failure to request additional records.

2. <u>Alleged Factual Errors</u>

Plaintiff next claims that the ALJ made factual errors, including misstating and mischaracterizing the evidence, and therefore denied Plaintiff a full and fair hearing.

First, Plaintiff alleges that the ALJ erred in characterizing Plaintiff's knee x-ray as normal when Plaintiff's knee pain could have been caused by something other than bone abnormality. Plaintiff further states that she had an MRI which showed medial ligament tear of the knee. This

argument is unavailing, as the medical evidence demonstrates Plaintiff did have a normal knee x-ray, (R. 791), and as the record Plaintiff cites to states that the MRI was conducted to assess for a "*possible* medial ligament tear."  (R. 154) (emphasis added).  The Court finds no error.

Next, Plaintiff contends that the ALJ incorrectly stated that Plaintiff has no significant spinal impairments, and that he mischaracterized the level of impairment of Plaintiff's knees, hands, and arms.  As discussed below, the Court finds that the ALJ did not err in finding these impairments to be non-severe.  *See infra* p. 21-23.

Finally, Plaintiff alleges that the ALJ erred in describing the extent to which Plaintiff could care for her disabled child, and this error allowed the ALJ to improperly assess Plaintiff's credibility.  As discussed below, because the ALJ's credibility assessment is supported by substantial evidence, this argument is without merit.  *See infra* p. 25-27.

### 3.  The "Treating Physician Rule"

Invoking what is commonly referred to as the "treating physician rule" or "treating source rule," Plaintiff argues that the ALJ failed to afford the proper weight to the opinions of Dr. Gross, Ms. Ennis, and Ms. Mott.

Under the "treating physician rule," a treating physician's opinion on the issues of the nature and severity of a claimant's impairments is given "controlling weight" if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).  The opinion of a treating source is accorded extra weight because of the continuity of the treatment that he or she provides, and the doctor-patient relationship, which places him or her in a unique position to make a complete and accurate diagnosis of the patient.  *Mongeur v. Heckler*, 722 F.2d

1033, 1039 n. 2 (2d Cir. 1983). However, the opinion of a treating source will not be afforded controlling weight if that opinion is not consistent with other substantial evidence in the record, including the opinions of other medical experts. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Even when a treating physician's opinion is not given "controlling" weight, the regulations require the ALJ to consider several factors in determining how much weight it should receive. *Halloran*, 362 F.3d at 32. Those factors include the length of the treatment relationship; the nature and extent of the treatment relationship; the supportability of the treating physician's opinion particularly by medical signs and laboratory findings; its consistency with the record as a whole; the physician's area of specialty; and other factors brought to the attention of the Social Security Administration that tend to support or contradict the opinion. *Id.*; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). After considering these factors, the ALJ must comprehensively set forth his reasons for the weight assigned to a treating physician's opinion. SSR 96-2P, 1996 WL 374188, at *5 (S.S.A. July 2, 1996). Failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand. *Sanders v. Comm'r of Soc. Sec.*, 506 Fed.App'x 74, 77 (2d Cir. 2012); *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

Plaintiff argues that the ALJ erred in giving controlling weight to the opinion of Dr. Gross. Specifically, Plaintiff asserts that the ALJ wrongly relied on a report from Dr. Gross created *after* Plaintiff's April 2012 surgery and not in determining Plaintiff's limitations both *before and after* the April 2012 surgery. Plaintiff's argument is not supported by the medical evidence of record. First, Dr. Gross's September 2012 report indicates that his opinion also applies to past limitations beginning on January 1, 2009. (R. 1145). In addition, the ALJ's

18

decision evidences his consideration of Plaintiff's limitations both prior to and following the April 2012 surgery:  The ALJ discusses how Plaintiff underwent left wrist surgery in August 2008, and considers the procedure report submitted by Dr. Gross in accordance with that surgery. (R. 78, 984-988).  Likewise, the ALJ discusses Dr. Gross's post-operative reports.  (*Id.*). Furthermore, the ALJ discusses Dr. Gross' treatment of Plaintiff in 2011 (a period of time before the April 2012 surgery).  (R. 79).  The Court finds no error in the weight given to the opinion of Dr. Gross.

The ALJ also did not err in the weight he assigned to the opinions of Ms. Ennis and Ms. Mott.  As an APRN and a therapist, respectively, Ms. Ennis and Ms. Mott are not considered "acceptable medical sources" for purposes of establishing the weight to give to their opinions, 20 C.F.R. §§ 404.1513, 416.913.  As the Second Circuit explained in *Genier v. Astrue*, 298 Fed. Appx. 105, 108 (2d Cir. 2008):

> According to Social Security Ruling 06-3p, "only 'acceptable medical sources' can be considered treating sources ... whose medical opinions may be entitled to controlling weight."  SSR 06-3p. "Acceptable medical sources" are further defined (by regulation) as licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists. 20 C.F.R §. 416.913(a).  In contrast... [the opinions of] "other sources" ... may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight.  20 C.F.R.§ 416.913(d)(1).  Therefore, while the ALJ is certainly free to consider the opinions of these "other sources" in making his overall assessment of a claimant's impairments and residual abilities, those opinions do not demand the same deference as those of a treating physician.

Ms. Ennis and Ms. Mott are considered "other sources," and thus their opinions are not entitled to controlling weight.  However, the ALJ must still consider any opinion given by Ms. Ennis and Ms. Mott.  *See* SSR 06-3p.

Regarding Ms. Ennis, Plaintiff claims the ALJ erred in giving more weight to the less restrictive opinions of Ms. Ennis and of giving less weight to her more restrictive opinions.  The

ALJ specifically explains that while he gave no weight to Ms. Ennis's September 2011 statement, he did give some weight to her July 2012 statement because it was more consistent with the record as a whole.  (R. 81).  In particular, the ALJ notes that Ms. Ennis is a mental health professional who sees Plaintiff for psychotherapy and medication management, and that she has no medical basis for opining on Plaintiff's physical limitations such as her ability to sit, stand, and walk during a work day.  (*Id.*).  In fact, Ms. Ennis notes in her statement that, as a psychiatric provider, she would not be able to comment on Plaintiff's lifting, carrying, balancing, posture, or use of hands.  (R. 769).  The Court finds that the ALJ did not err in the weight he gave to Ms. Ennis's opinion.

With respect to Ms. Mott, Plaintiff attempts to attribute Ms. Mott's opinion to Dr. Combrink-Graham, who co-signed the opinion.  When there is no evidence that the co-signing doctor ever acted as Plaintiff's treating physician, or worked in close consultation on the treatment of Plaintiff, an ALJ is not required to give the opinion the controlling weight afforded to a treating source.  *See Payne v. Astrue*, No. 3:10-CV-1565 JCH, 2011 WL 2471288, at *5 (D. Conn. June 21, 2011).  S*ee also Beebe v. Astrue*, No. 5:10-CV-1467, 2012 WL 3791258, at *8 (N.D.N.Y. Aug. 31, 2012) (finding no error when the ALJ failed to assign controlling weight to the opinion of a nurse practitioner co-signed by a physician when there was no evidence the physician "ever personally examined plaintiff or had an ongoing treatment and physician-patient relationship with plaintiff").   Therefore, Ms. Mott's opinion was not entitled to controlling weight on this basis.

In addition, the Court finds unavailing Plaintiff's argument that the ALJ erred in giving more weight to the less restrictive opinions of Ms. Mott and of giving less weight to more restrictive opinions.  The ALJ fully sets forth Ms. Mott's findings in his decision, and then

explains the amount of weight given to her opinion.  An ALJ "has discretion to determine the appropriate weight to accord the [other source's] opinion based on all the evidence before him." *Diaz v. Shalala*, 59 F.3d 307, 314 (2d Cir.1995).   In all, the ALJ properly used his discretion in determining the weight to give to Ms. Mott's opinion.

4. <u>Severe  Impairments</u>

At step two of the sequential evaluation process the ALJ found that Plaintiff has the following severe impairments: chronic generalized tendonitis of both upper extremities, status post multiple surgeries; degenerative disc disease; type two diabetes mellitus; obesity; bipolar disorder; and an adjustment disorder with mixed depressed mood and anxiety.  (R. 75).  Plaintiff argues that the ALJ erred in not also finding as severe Plaintiff's additional impairments, including carpal tunnel syndrome, cervical disc arthritis, asthma, migraine headaches, and major depressive disorder.  Plaintiff additionally argues that the ALJ failed to consider these impairments in combination with all of Plaintiff's other impairments.

 At the second step of the disability evaluation process, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe."  20 C.F.R. § 1520(c); 20 C.F.R. § 416.920(c).  At this step, medical evidence alone is considered in assessing the effect of the impairment or impairments on an individual's ability to do basic work activities.  SSR 85–28 (S.S.A. 1985).

The regulations provide that the ALJ is to consider the combined effects of all of a claimant's impairments without regard to whether any one impairment, if considered separately, would be of sufficient severity to be the basis of eligibility under the law.  *See* 20 C.F.R. § 404.1523; 20 C.F.R. § 416.923.  If the claimant is found to have a medically severe combination of impairments, the combined impact of those impairments will be considered throughout the

disability determination process.  *Id.*  An impairment or combination of impairments is considered "not severe" and a finding of "not disabled" is made at this step when the medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work.  SSR 85–28.  The Second Circuit has held that an argument that an ALJ should have found an impairment severe is "without merit" when the claimant "did not furnish the ALJ with any medical evidence showing how these alleged impairments limited his ability to work."  *Britt v. Astrue*, 486 Fed.App'x 161, 163 (2d Cir. 2012).

Here, the medical evidence does not support Plaintiff's claims of additional severe impairments.  First, Plaintiff claims her carpal tunnel syndrome is a severe impairment.  The record shows that Plaintiff has a medical history of carpal tunnel syndrome; however, the record does not support Plaintiff's position of severity.  Plaintiff has failed to point to evidence demonstrating that her carpal tunnel syndrome has limited her ability to do work.  *See Britt*, 486 Fed.App'x at 163.  Rather, the evidence shows that surgery alleviated her symptoms.  (R. 984, 1040).  And that she was asymptomatic in July 2012.  (R. 1046).  It also shows that Plaintiff's treating physician opined Plaintiff could frequently handle and finger, and continuously feel, with both hands.  (R. 1142).

Plaintiff points to evidence in the record which shows that she has a past medical history of cervical disc arthritis and asthma.  The Court cannot, however, find any evidence in the record (and Plaintiff has not cited to any) to support a finding that these impairments are severe.  With respect to major depressive disorder, again, there is evidence in the record that Plaintiff has a history of depression and anxiety, but no evidence that it results in functional limitations.  For example, Ms. Mott opines that Plaintiff maintains activities of daily living most of the time.  (R.

602).  In addition, Ms. Ennis reports only mild and moderate restrictions resulting from

Plaintiff's mental impairments.  (R. 1103-1104).  Likewise, Plaintiff has failed to show that her

migraine headaches result in functional limitations.  Instead, the evidence shows that Plaintiff's

CT scan was normal and her headaches were alleviated with Tylenol.  (R. 848, 175).  The Court

concludes that Plaintiff's diagnoses and past history of these conditions, alone, are not sufficient

to support a finding of severity.  *See Burrows v. Barnhart*, No. CIV 3:03CV342 (CFD)(TPS),

2007 WL 708627, at *6 (D. Conn. Feb. 20, 2007) (a diagnoses of an impairment "says nothing

about the severity of the condition") (citation omitted); *Ortiz v. Colvin*, No. 3:13 CV 610 (JGM),

2014 WL 819960, at *10 (D. Conn. Mar. 3, 2014) (finding no error in ALJ's finding of non-

severity when claimant received treatment for headaches but neurological testing was normal).

In sum, the ALJ's decision regarding Plaintiff's severe impairments is supported by

substantial evidence.  The Court finds that the ALJ considered Plaintiff's impairments, alone and

in combination, and did not err in determining that Plaintiff's carpal tunnel syndrome, cervical

disc arthritis, asthma, migraine headaches, and major depressive disorder were not severe

impairments.

5. Listed Impairments

Plaintiff next argues that the ALJ erred in finding that her spinal impairments failed to

meet listing 1.04A of the Listings.  To meet the requirements of listing 1.04A, Plaintiff must

show the following:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis,
> spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral
> fracture), resulting in compromise of a nerve root (including the cauda equina) or
> the spinal cord. With: A. Evidence of nerve root compression characterized by
> neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss
> (atrophy with associated muscle weakness or muscle weakness) accompanied by
> sensory or reflex loss and, if there is involvement of the lower back, positive
> straight-leg raising test (sitting and supine).

20 C.F.R. § Pt. 404, Subpt. P, App. 1; *see Norman v. Astrue*, 912 F. Supp.2d 33, 41 (S.D.N.Y. 2012) ("In order to meet the requirements of Listing1.04A, the plaintiff must demonstrate each of the following spinal disorder criteria; (1) "[e]vidence of nerve root compression; " (2) "neuro-anatomic distribution of pain; " (3) "limitation of motion of the spine; " (4) motor loss (atrophy with associated muscle weakness or muscle weakness); " and (5) sensory or reflex loss.").

The burden of proof is on the Plaintiff to present evidence she satisfies the requirements of the Listing.  *See Ruiz v. Apfel*, 26 F.Supp.2d 357, 367 (D. Conn. 1998).  "For a claimant to show that [an] impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  Here, Plaintiff has not pointed to any evidence in the medical record that demonstrates she meets the *specific requirements* of Listing 1.01A.  *See McChea v. Colvin*, No. 11-1132-AVC, slip op. 9 (D. Conn. Sept. 20, 2014) (holding that the ALJ did not err in finding claimant failed to meet a listing when Plaintiff's assertion that she did met the listing was "hollow without medically documented evidence").

In addition, the ALJ's determination that Plaintiff's spine ailments did not meet listing 1.04A is supported by evidence in the record.  Specifically, both state agency physicians considered Listing 1.04 in their evaluation of Plaintiff, and both physicians determined Plaintiff did not meet this listing.  (R. 334, 358).  *See Feretti v. Colvin*, No. 3:13CV00753 AVC, 2014 WL 3895921, at *8 (D. Conn. Aug. 8, 2014) (when two state's agency physicians found that claimant did not meet any listed impairment, and there was no evidence to the contrary, ALJ's decision that claimant did not satisfy any listed impairment was supported by substantial evidence).

In sum, the Court finds that the ALJ did not make any legal error and that his decision that Plaintiff did not have a listing impairment was supported by substantial evidence[9].

6. Plaintiff's Credibility

Plaintiff next challenges the ALJ's credibility determination. She objects to the ALJ's use of boilerplate language[10] and asserts that the ALJ failed to provide specific reasons for his credibility determination.

Initially, the Court notes that it is the function of the Commissioner, not this Court, to appraise the credibility of the claimant. *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). Here, the ALJ did not just use this boilerplate paragraph. Had he done so without more, it would have been error. *See Wages v. Comm'r of Social Security*, No. 3:11cv1571, 2013 WL 3243116, at *4 (D. Conn. June 26, 2013); *Halmers v. Colvin*, No. 3:12cv288, 2013 WL 5423688, at *7 (D. Conn. Sept. 26, 2013). Rather, the ALJ discusses the two-step process prescribed by the regulations. (R. 77-78). He reviews Plaintiff's testimony concerning her symptoms (R. 78). He reviews Plaintiff's medical treatment records, Plaintiff's response to treatment, the reports of the consultative examiners, and Plaintiff's testimony concerning her activities of daily living (R. 78-82).

Plaintiff argues that the ALJ failed to make specific findings as to the precise location, duration, frequency, and intensity of her pain. While an ALJ may "reject subjective testimony concerning pain for lack of credibility, he must provide an explicit and sufficient explanation so

[9]	Plaintiff also argues that the ALJ did not make specific findings concerning the location, frequency, intensity, and duration of pain caused by each of Plaintiff's spinal ailments. This argument is addressed below. *See infra* p. 25-27.
[10]	The boilerplate language Plaintiff challenges is as follows: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 78).

that the decision can be reviewed by the court for legitimacy of reasoning and sufficient evidentiary support."  *Lugo v. Barnhart*, No. 04CIV1064(JSR)(MHD), 2008 WL 515927, at *23 (S.D.N.Y. Feb. 8, 2008) *report and recommendation adopted*, No. 04 CIV. 1064 (JSR), 2008 WL 516796 (S.D.N.Y. Feb. 27, 2008).  Here, the ALJ sufficiently explains why he found Plaintiff only partially credible.  For example, he notes that while Plaintiff has a history of lower back pain and has had treatment for such, "examinations have not revealed significant objective findings to support the severity of her condition."  (R. 79).  The ALJ cites specific examples from the record to support this statement.

Plaintiff also contends that she is entitled to substantial credibility because of her work history.  While it is true that a good work history may be probative of credibility, it is just one of many factors that the ALJ should consider.  *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998). Having work history does not automatically supersede the other factors that the ALJ is required to consider when evaluating the claimant's credibility.  *See Wavercak v. Astrue*, 420 Fed.App'x 91, 94 (2d Cir. 2011) (holding that the fact that plaintiff's good work history was not specifically referenced in the ALJ's decision did not undermine the credibility assessment, given the substantial evidence supporting his determination); *Diaz v. Astrue*, No. 3:11cv317, 2012 WL 3903388, at *8 (D. Conn. Aug. 2, 2012).  The Court finds no error in the ALJ's failure to specifically discuss it.

After a careful review of the record and the ALJ's credibility assessment, the Court concludes that the ALJ's credibility determination is supported by substantial evidence.

7.  Plaintiff's RFC

Plaintiff's next challenge is addressed to the ALJ's RFC assessment.  Plaintiff largely relies on arguments previously made and rejected by the Court.  Plaintiff first argues that the

ALJ did not have a complete record when assessing Plaintiff's RFC. The Court has already rejected this argument. *See supra* p. 15-16.

Next, Plaintiff claims the ALJ failed to include in his RFC description Plaintiff's limitations such as her asthma. As the Court discussed above, the medical record fails to document any functional limitations associated with this condition. *See supra* p. 22-23.

Finally, contrary to Plaintiff's assertions, the ALJ did consider Plaintiff's impairments for which there was some evidence of functional limitations. As discussed above, the ALJ gave proper weight to opinions of Plaintiff's treatment providers regarding these impairments. *See supra* p. 17-21. In all the Court finds no error in the ALJ's RFC assessment.

8. <u>Defendant's Burden as Step Five</u>

Plaintiff's last argument is that Defendant did not carry her burden at step five of showing that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform. Plaintiff argues that the representative jobs that the Vocational Expert identified that a hypothetical individual with Plaintiff's RFC could perform exceeded the RFC set forth by the ALJ.

The claimant bears the burden of proof at the first four steps, but the Commissioner bears the burden at the fifth step to prove that there is work in the national economy that the claimant is capable of performing. *E.g. Poupore v. Astrue*, 566 F.3d at 306; *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). In making a finding that Plaintiff was capable of working, the ALJ relied on the testimony of the Vocational Expert. (R. 83-84). "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion, and the hypothetical accurately reflects the limitations and capabilities of the claimant involved."

*McIntyre v. Colvin,* 758 F.3d 146, 151 (2d Cir. 2014) (internal quotation marks and citations omitted).

Plaintiff claims the Commissioner has not presented credible evidence of jobs which Plaintiff could actually perform within her RFC because the RFC the ALJ assessed was beyond Plaintiff's abilities.  As discussed above, the Court finds that the ALJ did not err is his RFC assessment.  The Court also finds no error with the hypotheticals that the ALJ posed to the Vocational Expert.  For example, the ALJ confirmed that the jobs the Vocational Expert said Plaintiff could perform took into account the sit/stand option component of Plaintiff's RFC.  (R. 116).  The ALJ also confirmed that the jobs the Vocational Expert testified to required only occasional use of one upper extremity and frequent use of the other.  (R. 118).  This is consistent with the opinion of Dr. Gross that Plaintiff could occasionally reach overhead and push/pull; could frequently handle, finger, and reach; and could continuously feel.  (R. 1142).

Plaintiff also claims that because the RFC limits Plaintiff to "simple instructions," Plaintiff is able to perform only jobs that fall into the reasoning level 1 category, and the jobs the Vocational Expert said Plaintiff could perform fall into reasoning level 2 (addresser, copy examiner) and reasoning level 3 (monitor).  The Dictionary of Occupational Titles "(DOT")" defines the reasoning levels.  Relevant here is as follows: "R1: Apply commonsense understanding to carry out simple one- or two-step instructions…; R2: Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions…; R3: Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form…"  *Lovell v. Astrue*, No. 2:12-CV-128, 2013 WL 174886, at *8 (D. Vt. Jan. 16, 2013) (citing U.S. Dep't of Labor, *Dictionary of Occupational Titles*, 1991 WL 688702 (4th ed.1991)).

This district has held that a limitation to work with simple instructions is consistent with jobs in reasoning levels 1, 2, and 3: *See Jones-Reid v. Astrue*, 934 F.Supp.2d 381, 409 (D. Conn. 2012) *aff'd*, 515 F. App'x 32 (2d Cir. 2013) (finding that a limitation to "only short, simple instructions" is "not inconsistent with" jobs requiring reasoning levels 2 or 3).  Therefore, the Court finds no error in the ALJ's step five finding.

## Conclusion

After a thorough review of the administrative record and consideration of all of the arguments raised by Plaintiff, the Court concludes that the ALJ did not commit any legal errors and that his decision is supported by substantial evidence.  Accordingly, the Court recommends that Defendant's Motion to Affirm the Decision of the Commissioner [Doc. # 22] should be GRANTED and that Plaintiff's Motion to Reverse [Doc. # 15] should be DENIED.

This is a Recommended Ruling.  *See* Fed. R. Civ. P. 72(b)(1).  Any objection to this Recommended Ruling must be filed within 14 days after service.  *See* Fed. R. Civ. P. 72(b)(2). In accordance with the Standing Order of Referral for Appeals of Social Security Administration Decisions dated September 30, 2011, the Clerk is directed to transfer this case to a District Judge for review of the Recommended Ruling and any objections thereto, and acceptance, rejection, or modification of the Recommended Ruling in whole or in part.  *See* Fed. R. Civ. P. 72(b)(3) and D. Conn. Local  Rule 72.1(C)(1) for Magistrate Judges.

SO ORDERED, this  _28th_ day of January, 2015, at Bridgeport, Connecticut.

 */s/ William I. Garfinkel*
WILLIAM I. GARFINKEL
United States Magistrate Judge